UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x
DR. MARIA LA RUSSO, an attorney in fact for A. Matthew
De Lucia,

                Plaintiff,

      - against -

ST. GEORGE'S UNIVERSITY SCHOOL OF MEDICINE,
and John Does 1-5 and Jane Does 1-5 (as employees, agents,
and/or servants of St. George's and/or as independent
contractors),

                Defendants.
-------------------------------------------------------------------------x

**OPINION AND ORDER**

12-cv-03093 (ER)

Ramos, D.J.:

       Plaintiff Dr. Maria La Russo ("Plaintiff" or "Dr. La Russo"), as attorney-in-fact for A. Matthew De Lucia ("De Lucia"), brings this action against St George's University School of Medicine ("Defendant" or "St. George's" or "School of Medicine"), alleging medical malpractice, breach of contract, and negligence.  The action was removed from state court by St. George's University, Ltd. ("SGU Ltd."), as "the entity that owns and operates the non-juridical named defendant in the caption, 'St. George's University School of Medicine.'"  Doc. 1.

       Before the Court are Plaintiff's motion to amend the complaint to join certain defendants and remand, Doc. 7, and SGU, Ltd.'s motion to dismiss, Doc. 10.  For the reasons discussed below, SGU, Ltd.'s motion to dismiss is GRANTED.  Because SGU Ltd.'s motion to dismiss is granted, the Court does not consider Plaintiff's motion to amend and remand, which is DENIED as moot.

## I.   Factual Background

Plaintiff is the attorney-in-fact for her son, De Lucia.  Compl. ¶ 24.  In August 2007, at

the age of twenty-one, De Lucia began attending St. George's, located in the island of Grenada.

*Id.* ¶¶ 2, 25.  Prior to attending St. George's, De Lucia attended an "Information Session" hosted

by the school in New York City.  *Id.* ¶ 57.  At that session, admissions staff assured the attendees

that there would be medical facilities and treatment available for students at the Grenada campus.

*Id.*  De Lucia was also provided a publication entitled "St. George's University School of

Medicine; Think Beyond; 2005-2006."  *Id.* ¶ 58.  Under the heading "University Health

Services," it states:

> University Health Services (UHS) maintains modern clinic
> facilities with scheduled and walk-in hours from 9:00 am to 4:30
> pm, Monday through Friday.  Additionally, there is daily 24-hour
> coverage by well-credentialed physicians and physician assistants
> to provide students with emergency care when the clinic is closed.
> Medical emergencies in Grenada are referred to Grenada General
> Hospital or St. Augustine Clinic. . . . University Health Services
> facilitates with air evacuation, if indicated, on both campuses.

*Id.* ¶ 58.

In January 2007, De Lucia received a letter from St. George's, offering him admission for

the 2007/2008 school year.  *Id.* ¶ 59.  Enclosed with the letter was a "Student Support Services"

handbook from the Office of the Dean of Students, which stated:  "The Office of the Dean of

Students advocates on behalf of students to help you make the best use of the services available

both on and off campus.  Any student with mental or physical disabilities is provided a wide

range of support services."  *Id.*  The handbook also stated, under the heading "University Health

Services":

> St. George's University Health Services (UHS) provides the
> University community with an outpatient clinic and easy-access

2

> healthcare. . . . In addition to the regular clinic hours . . . UHS provides emergency medical services 24 hours a day, 7 days a week.  An excellent, dedicated team of physicians, clinical tutors and physical extenders with varied backgrounds maintains this service.  Medical emergencies in Grenada are referred to Grenada General Hospital or St. Augustine Clinic. . . . UHS facilitates air evacuation if necessary on both campuses.

*Id.* ¶ 60.

De Lucia began attending St. George's in the fall of 2007.  *Id.* ¶ 63.  In the spring of 2009, De Lucia met with his faculty advisor at St. George's, Dr. Jacqueline Stanley, to discuss concerns with stress and academic issues.  *Id.* ¶ 26.  De Lucia arrived at that meeting wearing sweatpants (despite Grenada's hot climate) and looking disheveled.  *Id.*  De Lucia indicated during the meeting that he wanted to see the dean regarding his concerns about academic issues.  *Id.*  Dr. Stanley told De Lucia that he could not go see the dean dressed as he was, and counseled him to go to the beach and take a vacation.  *Id.*  Though De Lucia appeared disheveled, anxious and stressed, Dr. Stanley did not advise him to visit the counseling department, speak with the dean of students, or see any medical or mental health professional.  *Id.*

De Lucia took Dr. Stanley's advice and went on a sailing trip in May 2009.  *Id.* ¶ 27. When he returned to St. George's from the trip, De Lucia was seriously ill; he had entered a state of "psychological crisis," and was disoriented, sickly, and had been aimlessly wandering on and off the St. George's campus.  *Id.* ¶ 28.  Fellow students at St. George's alerted school officials to De Lucia's condition and, in response, St. George's school security officers picked him up in the middle of the night and escorted him off the campus to Mount Gay Hospital ("Mount Gay"), also located in Grenada.  *Id.* ¶¶ 29-30.  Due to his condition, De Lucia was unable to consent to any form of treatment and was therefore involuntarily admitted to Mount Gay.  *Id.* ¶ 31.

Although St. George's had on file the contact information of Plaintiff and her husband, Dr. De Lucia, no representative of the school contacted De Lucia's parents to seek their consent regarding his admission to Mount Gay or to inform them of De Lucia's medical status. *Id.* ¶ 32. A fellow student at the school contacted De Lucia's parents and informed them of his transfer to Mount Gay. *Id.* ¶ 33. The student stated that Mount Gay was commonly known for its deplorable conditions and reputation among the medical student population, especially in regard to outdated medical intervention and treatment. *Id.* After unsuccessfully attempting to reach school personnel over the telephone, Dr. De Lucia made plans to travel to Grenada. *Id.* ¶ 34.

Dr. De Lucia arrived in Grenada and visited Mount Gay on or about May 14, 2009. *Id.* ¶ 35. Upon his arrival at the hospital, he found his son in an outdoor cell lying on a concrete floor without a mattress, naked except for boxer shorts. *Id.* ¶ 36. De Lucia was incoherent due to overdosing on Haldol and other drugs, and was experiencing muscle weakness, muscle tremors, dilated eyes, drowsiness, and dry mouth and lips due to his overmedication and lack of adequate hydration. *Id.* ¶¶ 37-38. De Lucia's body was covered in insect bites and a noxious odor of urine and feces permeated his person. *Id.* ¶ 39. Dr. De Lucia did not observe any identifiable medical professionals or supervisory staff on duty at the hospital. *Id.* ¶ 40.

Dr. De Lucia informed Plaintiff of the situation, and Plaintiff thereafter made arrangements to travel to Grenada. *Id.* ¶ 41. After Plaintiff's arrival in Grenada, she and Dr. De Lucia returned to Mount Gay to attempt to have their son released. *Id.* ¶ 42. On that visit, they observed that De Lucia appeared frightened and agitated when touched. *Id.* ¶ 43. They also observed other patients wandering in and around aimlessly without supervision, posing risk to De Lucia. *Id.* ¶ 44. Dr. De Lucia was able to secure De Lucia's release from the hospital on May 16, 2009, and returned with him to the United States the following day. *Id.* ¶ 46.

4

After a period of time during which De Lucia sought treatment in an effort to recover, he decided that he wanted to complete medical school, and returned to St. George's in the fall of 2009. *Id.* ¶ 47. He was able to complete one semester of coursework, but became ill in January 2010. *Id.* At that time, De Lucia visited the counseling office at the school, and they sent him to St. Augustine's Hospital, where he was admitted. *Id.* Plaintiff and Dr. De Lucia flew to Grenada and returned to the United States with De Lucia. *Id.* Still wanting to earn his medical degree, De Lucia sought treatment in an effort to recover, and again returned to St. George's in the fall of 2010. *Id.* ¶ 48. Before classes began, however, De Lucia's mental condition deteriorated, requiring him to return to the United Sates without earning his medical degree. *Id.*

## II.   Procedural Background

On November 15, 2011, Plaintiff filed a Summons with Notice in the Supreme Court of the State of New York, Westchester County, which named "St. George's University School of Medicine" as the sole defendant. Declaration of Myron Beldock ("Beldock Decl.") Ex. A. That same day, the summons was amended to add the "Doe" Defendants 1 through 5. Beldock Decl. Ex. B. On February 24, 2012, Plaintiff served Defendant pursuant to N.Y. Bus. Corp. Law § 307 by serving a copy of the Summons with Notice on the New York Secretary of State and mailing a copy of same by certified mail to Grenada. Beldock Decl. Ex. G (Beldock Aff.) ¶ 9. That same day, Plaintiff also served the Summons with Notice on St. George's University, LLC ("SGU LLC") by personal service on its registered agent in Delaware, and on University Support Services, LLC ("USS LLC") by service on the New York Secretary of State and by personal service on its registered agent in Delaware. *Id.*

On March 7, 2012, Plaintiff moved by Order to Show Cause ("OTSC") seeking permission to file a supplemental summons adding SGU Ltd., SGU LLC, USS LLC, and Dr.

Stanley as defendants, and seeking a ruling that the claims against the proposed additional defendants related back to the time the initial summons was filed.  Beldock Decl. Ex. G.  The OTSC was issued by the Honorable Joan B. Lefkowitz on March 12, 2012, returnable on April 20, 2012.  Beldock Decl. Ex. I.  Without making an appearance in the state case, SGU Ltd. demanded a complaint setting forth the bases for Plaintiff's claim, which was filed on April 5, 2012.  Beldock Decl. Ex. H.  On April 19, 2012, one day prior to the return date of Plaintiff's state court application, SGU Ltd. filed a Notice of Removal to this Court as "the entity that owns and operates the non-juridical named defendant in the caption."  Doc. 1.

## III.   Nature of Motions

Before the Court are two motions which present substantially overlapping issues.  First, Plaintiff has filed a motion to amend the Complaint to join as defendants SGU Ltd., SGU LLC, USS LLC, and Dr. Stanley.  Both parties appear to concede that SGU Ltd. and Dr. Stanley are a foreign entity and individual, respectively, and would therefore not destroy diversity jurisdiction.  Defendant's Opposition to Plaintiff's Motion to Amend ("Opp. to Mot. to Amend") at 1 n.1.  SGU LLC and USS LLC, on the other hand, are New York citizens, the joinder of which would destroy full diversity of citizenship, as Plaintiff is a New York resident.  *Id.* 1.

SGU Ltd. has separately filed a motion to dismiss the Complaint on several bases.  First, SGU Ltd. argues that the Complaint should be dismissed for insufficient process because the School of Medicine, the entity Plaintiff purported to have served with the summons and notice, has no independent legal existence having legal capacity to be sued.  Mot. to Dismiss 8.  SGU Ltd. contends that as the entity that owns and operates St. George's, it has never been actually named or served with process.  Accordingly, SGU Ltd. argues that no action was ever validly commenced because the initial summons named a non-existing entity, and that the statute of

limitations has thus run.  *Id.* 9.  Second, SGU Ltd. argues that even assuming it was properly

named and served with the initial summons, Plaintiff's claims would still be time-barred, as the

original summons and notice was filed one day after the statute of limitations had run.  *Id.* 9-10.

Finally, SGU Ltd. argues that the case should be dismissed under the doctrine of *forum non

conveniens*.  *Id.* 15.[1]

## IV.   SGU Ltd.'s Removal was Proper

Plaintiff argues that the Court lacks jurisdiction to accept the removal of SGU Ltd.

because SGU Ltd. has never formally intervened in the action or been joined as a defendant.

Opposition to Motion to Dismiss ("Opp. to MTD") 10-12.  In support of its argument, Plaintiff

cites several cases holding that non-parties to an action do not have standing to remove under 28

U.S.C. § 1441.  These cases are distinguishable, however, in that they involve removal by non-

parties to an action in which there was no dispute as to the legal existence of the named

defendant.  *See, e.g.*, *JRA Holding, Inc. v. McCleary*, No. 95-7702, 100 F.3d 944 (2d Cir. 1996)

(removal by non-party prior owner of apartment in lawsuit by current owner against lessee)

(summary order); *Whitney Lane Holdings, LLC v. Don Realty, LLC*, 08 Civ. 775 (GLS) (RFT),

2009 WL 6315323, at *1-*7 (N.D.N.Y. Oct. 27, 2009) (Report & Recommendation), *adopted in

relevant part*, 2010 WL 1257879 (N.D.N.Y. Mar. 26, 2010) (remanding case removed by non-

party assignee of mortgage in lawsuit by purchaser of real property against seller and original

holder of mortgage); *Am. Home Assur. Co. v. RJR Nabisco Holdings Corp.*, 70 F. Supp. 2d 296,

298-99 (S.D.N.Y. 1999) (remanding case removed by subsidiary of named defendant claiming to

be the real party in interest).

---

[1] SGU Ltd. also argues that Plaintiff's demands for student loan repayment and punitive damages should be stricken.
*Id.* 21.  However, because the Court finds that dismissal of Plaintiff's claims is appropriate, it does not consider
Defendant's arguments regarding the damages requested.

Here, on the other hand, although SGU Ltd. has not formally appeared as a defendant in the action, it removed the case as the owner and operator of St. George's, which it claims is a "non-juridical" entity.  Courts addressing the issue presented here have held that, where a plaintiff has named a non-juridical entity, the intended proper defendant may remove the case where it is on notice that the wrong defendant was named.  *See, e.g.*, *Ware v. Wyndham Worldwide Inc.*, No. 09-6420 (RBK) (AMD), 2010 WL 2545168, at *1-*6 (D.N.J. June 18, 2010) (where non-existent entity was named as defendant, holding that thirty-day removal window began to run on intended defendant as of the time it accepted the initial service on the non-existent entity and ascertained that it was the intended defendant); *Hillberry v. Wal-Mart Stores East, L.P.*, No. 05 Civ. 63-H, 2005 WL 1862087, at *1-*2 (W.D. Ky. Aug. 3, 2005) (holding that case was properly removed where initial complaint named non-existent entity, "Wal-Mart," and notice of removal was filed by the proper corporate defendant, "Wal-Mart Stores East, L.P."); *Pioneer Exploration, Ltd. v. Kansas Gas Serv. Co.*, No. 04-1335 (WEB), 2004 WL 2931403, at *3-*4 (D. Kan. Dec. 17, 2004) (where complaint named "Kansas Gas Service Company," an unincorporated division within ONEOK, Inc., holding that removal by "ONEOK, Inc." was proper where court determined that it was the party against whom judgment was sought); *see also Lee v. Food Lion, LLC*, No. 12 Civ. 142 (RGD), 2013 WL 588767, at *2-*4 (E.D. Va. Feb. 13, 2013) (holding that notice of removal was untimely because intended corporate defendant, Food Lion, LLC, did not remove within 30 days of receiving copy of complaint naming "Food Lion Stores, Inc.," a non-existent entity, and ascertaining that it was the intended defendant of the lawsuit).[2]  Accordingly, SGU Ltd. properly removed this action as the

---

[2] In its sur-reply in further opposition to SGU Ltd.'s motion to dismiss, Plaintiff attempts to distinguish several of the above-cited cases by arguing that the removing entities had appeared in the state case prior to removal and/or accepted service of process on behalf of the non-juridical entity.  Plaintiff argues that SGU Ltd.'s removal is

owner and operator of the School of Medicine, a "non-juridical" entity.[3]

## V.   Motion to Dismiss for Failure to Comply with Statute of Limitations[4]

### a.   Standard of Review

A motion to dismiss for failure to comply with the statute of limitations is treated as a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6). *Adams v. Crystal City Marriott Hotel*, No. 02 Civ. 10258 (PKL), 2004 WL 744489, at *2 (S.D.N.Y. Apr. 6, 2004) (citing *Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989)).  Rule 12(b)(6) provides the most appropriate legal basis for a motion to dismiss on statute of limitations grounds because the expiration of the statute of limitations presents an affirmative defense.  *Id.*

---

therefore improper because it did not accept service of process on behalf of the School of Medicine or appear in the state court case.  The fact that SGU Ltd. did not formally appear in the state action, however, does not preclude it from properly removing the case to this Court.  Although courts have considered whether the intended party was actually served with the complaint naming the non-existent or non-juridical entity, they have done so in the context of determining when the 30-day removal clock begins to run on the intended defendant.  *See, e.g., Ware*, 2010 WL 2545168, at *4-*5.  These decisions do not hold that proper service is *required* in order for an intended defendant to remove a case, but rather, that an intended defendant has a *duty* to remove within the 30-day time frame (assuming it desires to be in federal court) as of the time it "is on notice that the wrong company defendant has been named." *Hillberry*, 2005 WL 1862087, at *1.

[3] Plaintiff appears to dispute that Defendant is a non-juridical entity, and points to SGU Ltd.'s description of St. George's as an "unincorporated association" in the Notice of Removal.  Opp. to MTD 23.  According to Plaintiff, unincorporated associations can be sued pursuant to New York General Associations Law § 13, which states that an action "may be maintained, against the president or treasurer of [an unincorporated] association, for or upon which the plaintiff may maintain claim of ownership jointly or severally."  SGU Ltd. has repeatedly stated that the School of Medicine is a "non-juridical" entity "with no independent legal existence and no capacity to be sued."  Doc. 1 ¶ 10; Mot. to Dismiss 1.  Even assuming that St. George's is an "unincorporated association," however, Section 13 makes clear that an action against any such association can only be brought "against the president or treasurer." Plaintiff has not named any such persons in this action.  Moreover, Plaintiff does not appear to dispute that SGU Ltd. owns and operates the School of Medicine.

[4] Plaintiff has moved to join SGU Ltd., SGU LLC, USS LLC, and Dr. Stanley as defendants in this action, which SGU Ltd. has opposed.  *See* Docs. 7, 14.  The Court need not address Plaintiff's motion to join additional parties, however, because even if Plaintiff were permitted to add the additional defendants, the amended complaint would still be untimely under the applicable New York limitations periods.  Moreover, because federal courts sitting in diversity apply state statutes of limitations to state law claims, the Court need not remand the case prior to determining the timeliness of Plaintiff's claims.  *Diffley v. Allied-Signal, Inc.*, 921 F.2d 421, 423 (2d Cir. 1990) ("In diversity cases, 'state statutes of limitations govern the timeliness of state law claims.'") (citations omitted).

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), district courts are required to accept as true all factual allegations in the complaint and to draw all reasonable inferences in the plaintiff's favor. *Famous Horse Inc. v. 5th Ave. Photo Inc.,* 624 F.3d 106, 108 (2d Cir. 2010). However, this requirement does not apply to legal conclusions, bare assertions or conclusory allegations. *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 681 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In order to satisfy the pleading standard set forth in Rule 8 of the Federal Rules of Civil Procedure, a complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Accordingly, a plaintiff is required to support its claims with sufficient factual allegations to show "more than a sheer possibility that a defendant has acted unlawfully." *Id*. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

### b.  Plaintiff's Claims are Untimely

Defendant moves to dismiss Plaintiff's claims on the ground that they are time-barred. First, Defendant argues that Plaintiff's medical malpractice claim is untimely because the two and one-half year limitations period expired on November 14, 2011, one day before the summons was filed, and that the insanity toll does not apply to Plaintiff. Mot. to Dismiss 9-10, 14. Defendant further argues that Plaintiff's remaining claims are duplicative of the malpractice claim, and must therefore be dismissed under the "duplicative claims doctrine."[5]

---

[5] The statute of limitations for breach of contract and negligence claims under New York law is six and three years, respectively. *See* CPLR 213(2), 214(5). Defendant does not argue that those claims are themselves untimely, as the

The Court notes at the outset that Plaintiff appears to concede that her malpractice claim was filed after the two and one-half year statute of limitations had run.  She argues, however, that the Complaint adequately alleges facts supporting tolling of the statute of limitations during the period that De Lucia "was unable to function."  Opp. to MTD 16.   Accordingly, should the Court find that the statute of limitations was not tolled under CPLR 208, Plaintiff's medical malpractice claim must therefore be dismissed as untimely.

### i.  The Insanity Toll does not Apply

CPLR 208 provides for tolling of a limitations period "[i]f a person entitled to commence an action is under a disability because of  . . . insanity at the time the cause of action accrues."  Under New York law, the plaintiff bears the burden of proving that a limitation period should be tolled.  *Vallen v. Carrol*, No. 02 Civ. 5666 (PKC), 2005 WL 2296620, at *3 (S.D.N.Y. Sept. 20, 2005) (citing New York cases).  In *McCarthy v. Volkswagen of Am.*, 55 N.Y.2d 543 (1982), the leading New York case on the definition of "insanity" as used in CPLR 208, the Court of Appeals interpreted the insanity provision narrowly, holding that "the Legislature meant to extend the toll for insanity to only those individuals who are unable to protect their legal rights because of an over-all inability to function in society."  *Id.* at 548.  A plaintiff seeking to obtain the benefit of the statute must not only demonstrate that he suffered from such an "over-all inability to function in society," but also that the plaintiff was insane at the time the cause of action accrued or that the insanity was caused by the event upon which the suit is predicated, and that the insanity was continuous during the relevant statutory period.  *See De Los Santos v. Fingerson*, No. 97 Civ. 3972 (MBM), 1998 WL 740851, at *3-*4 (S.D.N.Y. Oct. 23, 1998) (citing *Graboi v. Kibel*, 432 F. Supp. 572, 578-79 (S.D.N.Y. 1977) ("[E]ven if a plaintiff is found

---

summons was filed approximately two and one-half years after the last date on which the actions could be said to have accrued.  *See Diffley*, 921 F.2d at 423.

either to have been insane at the time of or rendered insane by the occurrence, the insanity must also be found to have been continuous.  In other words, if the plaintiff had a lucid interval of significant duration, preceded and followed by a period of insanity, the toll is lost and is not resurrected when a plaintiff relapses into insanity.")).

Courts have consistently held that a "very high level of incapacity must be demonstrated before a plaintiff may successfully invoke Section 208." *Keitt v. City of NY*, No. 09 Civ. 5663 (PKC) (DF), 2010 WL 3466175, at *7 (S.D.N.Y. Aug. 9, 2010) (Report & Recommendation), *adopted*, 2010 WL 3466079 (S.D.N.Y. Sept. 2, 2010); *see also Dumas v. Agency for Child Dev.- New York City Head Start*, 569 F. Supp. 831, 833 (S.D.N.Y. 1983) (stating that a mental condition must be "severe and incapacitating" to qualify as insanity under CPLR 208); *Eisenbach v. Metro. Transp. Auth.*, 62 N.Y.2d 973, 975 (1984) (noting that insanity under CPLR 208 is "a concept equated with unsoundness of mind").  Following *McCarthy*, courts have noted that the statute "speaks in terms of insanity, not merely mental illness," and "apathy, depression, posttraumatic neurosis, psychological trauma and repression therefrom or mental illness alone have been held to be insufficient" to invoke the insanity toll.  *De Los Santos*, 1998 WL 740851, at *4 (citing *Wenzel v. Nassau Cnty. Police Dep't*, No. 93 Civ. 4888 (ADS), 1995 WL 836056, at *4 (E.D.N.Y. Aug. 5, 1995) (citing cases)); *see also Sanders v. Rosen*, 605 N.Y.S.2d 805, 814 (Sup. Ct. N.Y. Cnty. 1993) ("The Court of Appeals [has] made it quite plain that apathy, depression and neurosis are not so disabling as to toll the Statute of Limitations.").  In determining the applicability of the insanity toll, it is appropriate to "focus on the plaintiff's conduct and activities."  *Dumas*, 569 F. Supp. at 834 n.5 (citing cases).  "Difficulty in functioning is not sufficient to establish insanity for purposes of § 208; rather, the plaintiff must be totally unable to function as a result of a 'severe and incapacitating' disability."  *Swartz v.*

12

*Berkshire Life Ins. Co.*, No. 99 Civ. 9462 (JGK), 2000 WL 1448627, at *5 (S.D.N.Y. Sept. 28, 2000) (citation omitted).  While an "extreme loss of cognitive function" has been found to satisfy the requirement, courts have refused to toll the statute of limitations even where a plaintiff suffers from "dementia and [a] psychotic disorder." *Keitt*, 2010 WL 3466175, at *7 (citing *Yannon v. RCA Corp.*, 131 A.D.2d 843 (2d Dep't 1987) (applying insanity toll where plaintiff suffered from "presenile dementia" that rendered him unable to tie a necktie or add two numbers); *Burgos v. City of New York*, 294 A.D.2d 173 (1st Dep't 2002) (holding that requirements not satisfied where plaintiff alleged that he suffered from "dementia and psychotic disorder" "due to multiple medical conditions that . . . existed for many years and [were] permanent").

Here, Plaintiff alleges that De Lucia met with his advisor in spring of 2009 "looking disheveled, [] dressed in sweat pants despite Grenada's hot climate, and want[ing] to see the dean regarding his concerns about academic issues."  Compl. ¶ 26.  Upon returning to St. George's from a sailing trip in May 2009, De Lucia was "disoriented, sickly, and had been aimlessly wandering on and off the St. George's campus."  *Id.* ¶ 28.  After De Lucia was transferred to Mount Gay Hospital by the school, De Lucia's father found him at the hospital appearing "incoherent due to overdosing of Haldol and other drugs," and "frightened when . . . touched by an aggressive patient."  *Id.* ¶¶ 35-37, 43.  After returning to the United States on May 17, 2009, De Lucia "sought treatment in an effort to recover," and ultimately decided to return to St. George's in the fall of 2009 to complete medical school.  *Id.* ¶ 47.  He was "able to complete one semester of coursework," but became ill in January 2010, at which time he was sent to St. Augustine's Hospital, and ultimately returned to the United States with his parents.  *Id.*  De Lucia "again sought treatment in an effort to recover, and again returned to St. George's in the

fall of 2010." *Id.* ¶ 48.  Before classes began, however, De Lucia's mental condition "deteriorated," requiring him to return to the United States.  *Id.*

Defendant argues, and Plaintiff appears to concede, that the malpractice cause of action accrued, at the latest, when De Lucia was transferred to Mount Gay, which occurred no later than May 14, 2009.  Mot. to Dismiss 9-10, 14.  Thus, the latest date on which the two and one-half years limitations period could have expired was November 14, 2011, one day prior to the filing of the summons in state court.  *Id.*  To satisfy the standard for insanity under CPLR 208, Plaintiff would therefore have to allege that De Lucia *continuously* experienced an "over-all inability to function in society" during the period between May 14, 2009 and November 14, 2011. Accepting all of Plaintiff's allegations as true and drawing all reasonable inferences in her favor, the Court finds that Plaintiff has failed to satisfy the very high standard for insanity under CPLR 208.

Even assuming that De Lucia had experienced an "extreme loss of cognitive function" as of and immediately following the time he was admitted to Mount Gay in May 2009, Plaintiff alleges that De Lucia was well enough to return to St. George's in the fall of 2009 after undergoing treatment.  Compl. ¶ 47.  Although he ultimately had to return home again in January 2010 after becoming ill, De Lucia was "able to complete one semester of coursework" prior to that time.  *Id.*  Moreover, De Lucia was apparently well enough to travel back to Grenada to return to school in the fall of 2010 after undergoing more treatment.  *Id.* ¶ 48.  Plaintiff's allegations therefore establish that De Lucia did not *continuously* experience a total "inability to function in society" during the relevant time period.  To the contrary, De Lucia was obviously able to "function" enough to return to Grenada on two separate occasions in an attempt to finish

14

medical school, and to complete a semester of coursework during one of those occasions.[6]

Moreover, assuming *arguendo* that De Lucia's mental condition upon his admission to Mount Gay was continuous throughout the relevant period, the Court finds that Plaintiff's allegations do not establish a disability so "severe and incapacitating" that it rendered De Lucia "totally unable to function."  *Swartz*, 2000 WL 1448627, at *5.  The only allegations Plaintiff makes regarding De Lucia's mental state during the relevant period is that he was "disoriented, sickly, and had been aimlessly wandering on and off the St. George's campus," and that during his stay at Mount Gay, he appeared "incoherent due to overdosing of Haldol and other drugs" and "frightened" when touched by an aggressive patient.  Compl. ¶¶ 28, 35-37, 43.  These allegations are insufficient as a matter of law to satisfy the very high standard required to invoke tolling for "insanity" under CPLR 208.  *See, e.g.*, *Callahan v. Image Bank*, 184 F. Supp. 2d 362, 363-64 (S.D.N.Y. 2002) (holding that allegations that plaintiff was "unable to work or care for herself," "unable to leave her home unescorted," "experienced severe side effects from medication and black-outs . . . experienced a period of hospitalization . . . arising from [] depression," and "suffers from suicidal ideation" were insufficient to satisfy the standard for tolling under CPLR 208); *Dumas*, 569 F. Supp. at 833 (holding that diagnosis of "schizophrenia, paranoid, chronic with acute exacerbation" did not result in tolling under CPLR 208, as plaintiff's disability "was not of the severe and incapacitating nature contemplated by the tolling statute," and noting that "[t]he statute speaks in terms of insanity, not merely mental illness"); *Eisenbach*, 62 N.Y.2d at 974 (holding that plaintiff's hospitalization during which strong painkillers were administered resulting in plaintiff being "generally confused, disoriented, and

---

[6] Moreover, although not determinative of the issue, the fact that Plaintiff filed the summons on November 15, 2011, one day after the statute of limitations had run, suggests that the one-day lapse was due to mere oversight or mistake, rather than De Lucia's inability to "protect [his] legal rights because of an over-all inability to function in society." *McCarthy*, 55 N.Y.2d at 548.

15

unable to effectively attend to [his] affairs" did not rise to the level of insanity under CPLR 208).

Moreover, to the extent that Plaintiff's allegations suggest that De Lucia suffered from an

unidentified "mental illness" which required him to undergo "continuous psychiatric care since

his return from Grenada in May 2009," Compl. ¶ 69, case law is clear that mental illness alone is

insufficient to invoke the insanity toll.  *See De Los Santos*, 1998 WL 740851, at *4.[7]

In the alternative, Plaintiff requests a hearing to determine whether De Lucia's mental

state during the relevant period meets the high standard for insanity under CPLR 208.[8]  Although

---

[7] The cases cited by Plaintiff do not compel a different outcome, as they were decided after an evidentiary hearing and involve illnesses and conditions far more serious and debilitating than the symptoms alleged here.  *Cairl v. Cnty. of Westchester*, 150 A.D.2d 749, 749 (2d Dep't 1989) (upholding decision that plaintiff was "insane" under CPLR 208 where she suffered from "paranoid schizophrenia and borderline personality disorder with symptoms of hallucinations and impulsive suicidal behavior necessitating frequent and multiple hospitalizations, constant medication and psychotherapy"); *Yannon*, 131 A.D.2d at 846 (permitting tolling for insanity where plaintiff was diagnosed with "a degenerative disease giving rise to a picture of a presenile dementia," "could not tie a necktie," and "was unable to add two-digit numbers").  Here, Plaintiff has failed to allege that De Lucia was diagnosed with *any* mental illness, or that his mental condition was so severe that it affected his cognitive functioning to such a degree that he was unable to perform daily tasks during the relevant time period.  Moreover, that De Lucia has continuously undergone psychiatric care since 2009 does not, in itself, satisfy the extremely high standard for "insanity" under CPLR 208.

[8] In her opposition papers, and without having previously received leave from this Court, Plaintiff requests that the Court grant her leave "to amend the complaint to expand its allegations" in order to demonstrate the "merits of the 'insanity' contention."  Opp. to MTD 18 n.6.  As a general rule, leave to amend a complaint should be freely granted.  *Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002).  District courts have broad discretion in deciding whether to grant leave to amend.  *Pasternack v. Laboratory Corp. of Am.*, No. 10 Civ. 4426 (PGG), 2012 WL 3871348, at *7 (S.D.N.Y. Sept. 6, 2012).  However, where the amendment would be futile or would result in undue prejudice to the opposing party, denying leave to amend is proper.  *Id.*  An amendment is considered futile where the plaintiff is unable to demonstrate that he would be able to cure the defects in a manner that would survive a motion to dismiss.  *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999).

Here, although Plaintiff has not attached a proposed amended complaint to her opposition papers, her attorney has provided the Court with a summary of the testimony that she would adduce regarding De Lucia's alleged "insanity" if the Court were to hold an evidentiary hearing on the issue.  *See* Beldock Decl. ¶ 23.  As discussed below, *see supra* n.9, the proposed testimony is duplicative of the facts alleged in the Complaint and would therefore not change the outcome.  Accordingly, the Court assumes that any amendments to the Complaint would be futile, as they would likely also merely reiterate the facts already alleged.  Moreover, as stated above, Plaintiff has not attached an Amended Complaint to her opposition papers, nor has she indicated how she would cure its pleading deficiencies other than stating generally that she would "expand [the] allegations."  Thus, the Court may properly deny Plaintiff's request for leave to amend, as Plaintiff has failed to specifically explain how she might amend the Complaint to cure its pleading deficiencies.  *See Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 218 (2d Cir. 2010) ("[I]n light of plaintiffs' failure to provide a specific explanation of the manner in which they propose to cure the defects in their complaint, we reject the claim that the district court erred in not granting leave to amend."); *Anatian v. Coutts Bank (Switzerland) Ltd.*, 193 F.3d 85, 89 (2d Cir. 1999) (upholding a district court's denial of

16

in some cases, it may be necessary for the court to conduct an evidentiary hearing on the issue, such a hearing is not required where, as here, the plaintiff's factual allegations, accepted as true, are not "sufficient to demonstrate the type of 'severe and incapacitating disability' that could render him eligible for statutory tolling." *Keitt*, 2010 WL 3466175, at *7-*8; *see also De Los Santos*, 1998 WL 740851, at *5 (noting that although a few lower courts have suggested that the question of a plaintiff's insanity should not be decided as a matter of law and that a hearing should be held, "these isolated cases are impossible to square with rulings by the New York Court of Appeals and the Second Circuit upholding the dismissal of cases where no such hearing was held").[9]

### ii. Plaintiff's Breach of Contract and Negligence Claims are Duplicative of the Malpractice Claim

SGU Ltd. argues that Plaintiff "has attempted to circumvent the limitations bar [on the malpractice claim] by restating the malpractice claim as claims for breach of contract and negligence." Mot. to Dismiss 2. Plaintiff, on the other hand, argues that she has pleaded facts sufficient to sustain independent bases for breach of contract and negligence. Opp. to MTD 13-16.

---

leave to amend in part because plaintiffs failed to show how they might amend the complaint to cure the deficiencies in the pleadings, "especially in light of the insufficiency of facts to support a claim").

[9] Moreover, Plaintiff's description of the testimony she would adduce at an evidentiary hearing suggests that any such testimony would be duplicative of the facts alleged in the Complaint. For example, the Beldock declaration states that the witnesses would testify "to the facts and circumstances surrounding [De Lucia's] psychological crisis in Grenada," "the improper and dangerous conditions at Mount Gay," "[De Lucia's] total inability to care for himself due to his disoriented and irrational state *at the time of the events* and for some time thereafter," "about [De Lucia's] condition *[at the time of his] psychiatric crisis*" and his "continued illness after his return to the United States." Beldock Decl. ¶ 23 (emphasis added). This testimony would therefore merely reiterate the allegations contained in the Complaint. The proposed testimony indicates only that De Lucia suffered a "psychotic crisis" rendering him incapable of caring for himself "*at the time of the events*" and for "sometime thereafter," which are facts that were alleged generally in the Complaint. The summary of testimony provided does not indicate that after De Lucia's return to the United States, his condition was so "severe and incapacitating" that it rendered him "totally unable to function" throughout the relevant time period. Moreover, that De Lucia suffered from "continued illness after his return to the United States" does not change the outcome, as mental illness alone is insufficient to satisfy the extremely high standard for "insanity" under CPLR 208. *See De Los Santos*, 1998 WL 740851, at *4.

In applying the statute of limitations, courts "look to the 'reality' or the 'essence' of the action and not its form." *Pacio v. Franklin Hosp.*, 63 A.D.3d 1130, 1132 (2d Dep't 2009) (citation omitted). Accordingly, where claims "are merely reformulations of [a] malpractice . . . claim[]," courts may dismiss those claims as untimely where the malpractice claim is time-barred. *Hazel v. Montefiore Med. Ctr.*, 243 A.D.2d 344, 345 (1st Dep't 1997); *see also Frumento v. On Rite Co., Inc.*, 66 A.D.3d 828, 830 (2d Dep't 2009) (holding that "[t]he plaintiff here cannot avoid the applicable three-year limitations period by asserting a cause of action to recover damages for fraud or fraudulent misrepresentation which, if colorable at all, was merely incidental to the claims based on negligence and strict products liability," which were time-barred).

### 1.  The Contract Claim

A cause of action for breach of contract will not be sustained where "it is merely a redundant pleading of plaintiff's malpractice claim in another guise, an attempt to plead as a contract action one which is essentially a malpractice action." *Abbondandolo v. Hitzig*, 282 A.D.2d 224, 225 (1st Dep't 2001) (quoting *Monroe v. Long Is. Coll. Hosp.*, 84 A.D.2d 576, 576 (2d Dep't 1981)). "The law is clear that a breach of contract claim arising out of the rendition of medical services by a physician will withstand a test to its legal sufficiency only where it is based upon an express special promise to effect a cure or to accomplish some definite result." *Monroe*, 84 A.D.2d at 576 (citing cases).

Here, Plaintiff alleges that "a contract was formed between St. George's and Mr. De Lucia when St. George's offered a variety of educational and related services to Mr. De Lucia and Mr. De Lucia agreed to, and did, pay tuition in exchange for those services." Compl. ¶ 77. Plaintiff claims that the statements included in several informational packets provided to De

Lucia prior to and upon his admission to St. George's constituted the terms of the purported

contract.  *Id.* ¶ 78.  The informational materials included statements that the school:  (i) had a

medical clinic on campus; (ii) had "daily 24-hour coverage by well-credentialed physicians and

physician assistants to provide students with emergency care when the clinic is closed"; (iii)

referred medical emergencies to Grenada General Hospital or St. Augustine Clinic; and (iv)

provided students with mental disabilities "a wide range of support services."  *Id.* ¶¶ 58-60.

Plaintiff claims that St. George's breached the contract when, "instead of providing medical

treatment by well-credentialed physicians and physician assistants at St. George's facilities,

appropriate emergency care, or emergency evacuation, St. George's failed to provide proper

medical treatment and Mr. De Lucia was transferred to Mount Gay Hospital."  *Id.* ¶ 79.  Plaintiff

further alleges that De Lucia "detrimentally relied" on the promises made by St. George's "by

attending St. George's and by taking on debt in the form of student loans."  *Id.* ¶ 81.

Plaintiff fails to allege a "special promise" by Defendant "to effect a cure or to

accomplish some definite result."  *Monroe*, 84 A.D.2d at 576.  Rather, the statements made by

Defendant in its promotional and informational materials simply describe the medical and mental

health services available on campus; they do not "promise" a specific course of treatment or

result for any particular condition a student may have while on campus.  *See Catapano v.*

*Winthrop Univ. Hosp.*, 19 A.D.3d 355, 355 (2d Dep't 2005) ("Contrary to the plaintiff's

contention, provisions of the 'Patient's Bill of Rights' do not constitute the requisite 'express

promise' or special agreement with the patient so as to furnish the basis for a breach of contract

claim.") (citation omitted); *Abbondandolo*, 282 A.D.2d at 225-26 (holding that plaintiff failed to

plead a breach of contract claim where the claim was predicated on defendant's "promotional

promises,"  because those statements "do not purport to guarantee a particular result to a

19

particular person beyond the generic goal of obtaining 'undetectable, permanent and natural' hair").  Plaintiff's allegations relate solely to the treatment that De Lucia received at the time he was found to be disoriented and "aimlessly wandering" on campus (Compl. ¶ 79); Plaintiff does not contend that the medical services Defendant "promised" would be available on campus were not in fact available.[10]  Accordingly, Plaintiff has failed to state a claim for breach of contract related to the treatment De Lucia received from the school during his "psychological crisis."[11] *Id.* ¶ 28.

## 2.  The Negligence Claim

Defendant argues that the incompetence alleged in the Complaint substantially relates to the medical diagnosis and treatment of De Lucia.  Mot. to Dismiss 12.  Accordingly, Defendant argues that Plaintiff's negligence claim cannot survive independent of one for malpractice.  *Id.*

In determining whether an action sounds in medical malpractice or simple negligence, the critical question is the nature of the duty to the plaintiff which the defendant is alleged to have breached.  *Stanley v. Lebetkin*, 123 A.D.2d 854, 854 (2d Dep't 1986).  "When the duty arises from the physician-patient relationship or is substantially related to medical treatment, the breach gives rise to an action sounding in medical malpractice, not simple negligence."  *Id.; see also*

---

[10] Plaintiff further alleges that the purported breach of contract resulted in the identical damages asserted in the medical malpractice claim:  "physical, psychiatric, emotional, and monetary injuries."  Compl. ¶¶ 75, 80, 82. Plaintiff therefore fails to allege that the injury flowing from the alleged breach of contract is distinct from the injury alleged to have resulted from Defendant's purported malpractice.  *See DiTondo v. Meagher*, 85 A.D.3d 1385, 1385 (3d Dep't 2011) ("Where an individual claim of breach of contract arises out of the same facts as an asserted legal malpractice cause of action and does not allege distinct damages, the breach of contract claim is duplicative of the malpractice claim.") (citations omitted).

[11] Plaintiff cites to *Nicoleau v. Brookhaven Mem. Hosp. Ctr.*, 201 A.D.2d 544, 545 (2d Dep't 1994), in support of her argument that Defendant made "express special promises" to De Lucia, which provide the basis for her breach of contract claim.  In *Nicoleau*, the court held that plaintiff stated a claim for breach of contract where her physician "specific[ally] promise[d] to deliver her baby without the administration of blood."  Here, on the other hand, Plaintiff does not allege that Defendant made "express special promises" apart from the information in the promotional material produced by the school, nor does she allege any specific promises regarding how the school would treat particular types of mental conditions or illnesses.

*Scott v. Uljanov*, 74 N.Y.2d 673, 674-75 (1989) (holding that negligence claim arising out of hospital's failure to "supervise" intoxicated patient who fell out of hospital bed was more properly characterized as malpractice claim for purposes of determining the applicable statute of limitations because the conduct at issue related to "the hospital's assessment of the supervisory and treatment needs" of the patient and therefore "constituted an integral part of the process of rendering medical treatment").

Here, Plaintiff alleges that Defendant and its employees, including "doctors, nurses, counselors, and/or medical personnel," improperly transferred De Lucia to Mount Gay, Compl. ¶ 73, failed to refer De Lucia to counseling, and failed to intervene and provide De Lucia with proper psychiatric and medical treatment. *Id.* ¶¶ 85-87. Plaintiff further alleges that Defendant "fail[ed] to properly train their employees and/or agents . . . to recognize and properly address a student's need for psychological services." *Id.* ¶ 86. The alleged negligent conduct clearly relates to the school's "assessment of the supervisory and treatment needs" of De Lucia, and therefore "constitute[] an integral part of the process of rendering medical treatment to him." *Scott*, 74 N.Y.2d at 675. Moreover, a claim that a medical institution failed to train employees to properly diagnose and treat patients restates a claim for malpractice. *See Matter of Barresi v. State of NY*, 232 A.D.2d 962, 964 (3d Dep't 1996); *see also Cullinan v. Pignataro*, 266 A.D.2d 807, 808 (4th Dep't 1999) (holding that allegation that defendant doctor inadequately supervised or trained office personnel who undertook medical treatment "does not change the gravamen of the complaint from malpractice to negligence").[12]

---

[12] As with Plaintiff' breach of contract claim, the injuries alleged to have flowed from Defendant's purported negligence are identical to those alleged to have been sustained by De Lucia as a result of the claimed malpractice. *Compare* Compl. ¶ 88 to ¶ 75.

Plaintiff argues that discovery may uncover that no medical personnel were involved in De Lucia's care while at St. George's and that no medical treatment was provided before the time he was transferred to Mount Gay.  Opp. to MTD 14.  Accordingly, Plaintiff contends, her claims may constitute negligence, not medical malpractice, if discovery suggests that no physician-patient relationship existed and that "the issue of [De Lucia's] transfer to Mount Gay can be determined as a matter of common knowledge rather than as matters requiring professional skill and knowledge."  *Id.*  Contrary to Plaintiff's argument, however, the Complaint alleges that Defendant and its employees, "including doctors, nurses, counselors, and/or medical personnel," failed to treat De Lucia and improperly transferred him to Mount Gay Hospital. Although Plaintiff argues that discovery may unveil that no licensed physician was involved in the decision to transfer De Lucia to Mount Gay, "[t]he mere possibility that a set of facts might be true does not support a reasonable inference of those facts.  In other words, a complaint based on speculation alone does not state a claim."  *Richner v. Smithkline Beecham Clinical Labs*, No. 96 Civ. 2523 (SS), 1996 WL 432473, at *2 (S.D.N.Y. Aug. 1, 1996) (rejecting plaintiff's argument that her claims sounded in general negligence because her misdiagnosis "might have been due to clerical as opposed to a medical error," where plaintiff "alleged no facts to support her theory that clerical error produced three false negatives in three years").

Moreover, to state a claim for negligence, a plaintiff must allege that the defendant breached a legal duty owed to him which proximately caused his injuries.  *Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000).  The question of the existence and scope of a defendant's duty is a legal issue for the court to resolve.  *Id.*  Although Plaintiff alleges that Defendant had a duty to "exercise reasonable care and diligence in safeguarding Mr. De Lucia, and ensuring that no unnecessary harm befell him," New York courts have consistently rejected

22

the doctrine of *in loco parentis* at the college level.  *See Wells v. Bard Coll.*, 184 A.D.2d 304,

304 (1st Dep't 1992) (citation omitted).  Accordingly, courts have held that colleges and

universities have "no obligation . . . to monitor the health of [students]," and that they have no

duty to "seek medical assistance on [students'] behal[ves]."  *Id.*; *see also McNeil v. Wagner*

*Coll.*, 246 A.D.2d 516, 517 (2d Dep't 1998) (holding that college "had no obligation to supervise

the plaintiff's health care").  To the extent that Mount Gay committed malpractice in its

treatment of De Lucia, it is *Mount Gay's* negligence, and not Defendant's, that is the proximate

cause of De Lucia's injury.[13]

---

[13] Assuming *arguendo* that Plaintiff adequately stated a claim for negligence and/or breach of contract, and if the Court granted Plaintiff's request to join additional parties as defendants, dismissal would still be warranted under the doctrine of *forum non conveniens*.  "A decision to grant or deny a motion to dismiss a cause of action under the doctrine of *forum non conveniens* lies wholly within the broad discretion of the district court."  *Scottish Air Int'l,, Inc. v. British Caledonian Grp., PLC*, 81 F.3d 1224, 1232 (2d Cir. 1996).  First, Plaintiff's factual allegations make clear that all the relevant events giving rise to Plaintiff's claims occurred in Grenada.  Moreover, many of the witnesses with first-hand knowledge of the facts giving rise to Plaintiff's claims reside in Grenada, including Dr. Stanley, the physicians and employees who evaluated De Lucia and referred him to Mount Gay, and the physicians and employees who treated De Lucia at Mount Gay.  This court lacks power to compel the attendance of non-party witnesses at a deposition or the production of documents in their possession.  *Ilusorio v. Ilusorio-Bildner,* 103 F. Supp. 2d 672, 677 (S.D.N.Y. 2000).  Although several of Plaintiff's witnesses are located in New York, *see* Beldock Decl. ¶ 23, the main issue in this case is whether St. George's committed malpractice and was otherwise negligent in its treatment of De Lucia.  In order for St. George's to disprove Plaintiff's allegations, it will require testimony from school and Mount Gay employees and physicians, as well as Dr. Stanley, all of whom are located in Grenada.  Mot. to Dismiss 19.  Thus, although there are "jurisdictional contacts in New York," the majority of the information and resources needed for trial is in Grenada.  *See Feinstein v. Curtain Bluff Resort*, No. 96 Civ. 8860 (RPP), 1998 WL 458060, at *5 (S.D.N.Y. Aug. 5, 1998) (dismissing action arising from plaintiff's food poisoning while staying at defendant hotel located in Antigua).  Moreover, most of the witnesses identified by Plaintiff have visited Grenada in the past, either as students of St. George's or as visitors, and are therefore presumably able to travel to Grenada for trial.  *Id.* at *6.  Second, Defendant argues, and Plaintiff does not appear to dispute, that Grenada is an adequate alternative forum for Plaintiff's claims.  *See* Decl. of Dickon A. Mitchell.  Although Plaintiff complains that the "pace of litigation" in Grenada is slower than in the United States, Opp. to MTD 14 n.5, this is insufficient to establish the inadequacy of Grenada as an alternative forum.  *See Aguinda v. Texaco, Inc.*, 303 F.3d 470, 478 (2d Cir. 2002) ("While Ecuador's judicial procedures may be less streamlined than ours, that does not make Ecuador's procedures ineffective or render Ecuador inadequate as an alternative forum.").

The thrust of Plaintiff's opposition to dismissal on *forum non conveniens* grounds is that, as a New York resident, Plaintiff's choice of venue is entitled to deference.  Although Plaintiff is correct that her choice of venue is entitled to considerable deference, her New York residence "is not automatically dispositive in determining a *forum non conveniens* motion" where there is an insufficient nexus between the forum and the events giving rise to the claims.  *Scottish Air Int'l, Inc.*, 81 F.3d at 1232.  "United States citizens who engage in activities abroad 'cannot expect always to bring their foreign opponents into a United States forum when every reasonable consideration leads to a conclusion that the site of the litigation should be elsewhere.'"  *Feinstein*, 1998 WL 458060, at *5 (citations omitted).  Finally, Plaintiff argues that New York is the proper forum because "[t]he contract at issue in the breach

## VI.     Conclusion

For the reasons set forth above, SGU, Ltd.'s motion to dismiss is GRANTED.  The Court does not consider Plaintiff's motion to amend the complaint to join additional defendants and to remand, which is DENIED as moot.

The Clerk of the Court is respectfully directed to terminate the motions and close this case.  Docs. 7, 10.

It is SO ORDERED.

Dated:  March 28, 2013
        White Plains, New York

_____
Edgardo Ramos, U.S.D.J.

---

of contract claim was entered into in New York state."  Opp. to MTD 22.  However, as discussed *supra*, the Court finds that Plaintiff has failed to state a cause of action for breach of contract, and the place in which the contract was entered is therefore irrelevant for purposes of the Court's *forum non conveniens* analysis.